IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'NEIL, | No. C 06-03914 SI |
| Plaintiff, | **ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| HENKEL ADHESIVE, dba HENKEL ADHESIVES CORPORATION, and DOES 1-10, inclusive, | |
| Defendants. / | |

On July 27, 2007, the Court heard argument on defendant's motion for summary judgment. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court GRANTS IN PART defendant's motion.

**BACKGROUND**

This lawsuit arises out of plaintiff's termination after fifteen years of employment at defendant's Hayward, California facility. At the Hayward facility, defendant Henkel Corporation makes industrial adhesives, i.e., glues. Defendant employed approximately 17 employees at the Hayward facility during the relevant period. Desombre Decl. ¶ 3. Defendant hired plaintiff Douglas O'Neil as a production worker in 1988. As a production worker, plaintiff was responsible for a variety of tasks, mostly involving manual labor, and including washing bins in which glue was mixed, preparing the raw ingredients for batches of glue, and taking out the trash. *See* Desombre Decl. ¶¶ 4-5; Sepulveda Decl. ¶ 3. Over the course of his employment, plaintiff was warned, reprimanded, suspended, or put on probation for performance problems on several occasions.

In February 2000, plaintiff developed an anal fissure, which is a tear in the mucosa of the anus. *See* Anderson Depo. at 9 (Champagne Decl., Ex. B). According to plaintiff, the fissure required him to alter his diet, and refrain from lifting heavy loads. *See* O'Neal Depo. (Pl.'s Ex. 1) at 16, 62, 65-66, 87. It is apparently undisputed that the fissure affected his ability to perform his job, and plaintiff's supervisors and coworkers knew of his condition.

On September 1, 2002, Yves-Edouard (AKA "Yed") Desombre became the new plant manager of the Hayward facility. *See* Desombre Decl. ¶ 1. Ciro Sepulveda was the production supervisor who directly supervised plaintiff and other production workers. *See* Sepulveda Decl. ¶¶ 1-2. In February or March of 2003, Desombre created two "lead person" positions, and selected John Levy and Shagun Worley for the positions. *See* Desombre Decl. ¶ 6. Desombre and Sepulveda instructed the leads each morning on what tasks needed to be done. The leads then assigned the tasks to the employees, including plaintiff. *See id.* ("The two leads were then to assign tasks to the other production employees, based upon the instructions we had given them."); Sepulveda Decl. ¶ 11 (Levy "was supposed to ask production employees to perform certain tasks, based upon Mr. Desombre's and my instructions."). According to defendant, the leads had no authority to hire, fire, discipline, or take any other managerial-type actions; they simply delegated tasks. *See* Desombre Decl. ¶ 6.

Plaintiff and Levy did not get along well. Their animosity came to a head on July 24, 2003, when Levy, in full view of plaintiff and several other employees, began rolling around on the floor, sticking out his buttocks, and repeatedly yelling: "Somebody fuck me in the ass. Oh my fissure hurts. I can't eat meat, pork, or beef." Pl.'s Ex. 8; *see also* O'Neil Depo. (Pl.'s Ex. 1) at 234:13-16 ("Rolling around on the floor, pointing at me, calling me a pussy, calling me a little bitch, spreading his cheeks in front of me, grabbing his dick, telling me to get fucked in the ass."). Several of the employees who witnessed the incident signed statements detailing their recollection thereof. *See* Pl.'s Ex. 9. For example, Robert Tufi wrote:

> On the 24th of July , 2003, I Robert Tufi witnessed John Levy hollerin[g] and screaming [']fuck me in the ass['] several times. Then to top it off he continued on with the act as if he was being fucked in the ass. This went on for awhile [sic]. And also he was yelling out that I smell a pussy in the plant.

*Id.* Michael Saguil Besabe, Sr. wrote:

2

> I was welding on tank 6 when I heard John Levy moaning and groaning about his stomach. Later I learned he was harassing Doug about his medical problem. I sat and watched him bend over at a 90[degree] angle, he cracked his butt open and said "fuck me in the ass". He then rolled on his back and continued saying "fuck me some more" . . . "fuck me some more", "that's a relief". Then he got up and said "I can't eat pork," "I can't eat beef", "I can't eat chicken because my fisher [sic] hurts". Then he said "pussy, pussy, pussy". He proceeded upstairs to the bench and continued saying "pussy, pussy, pussy".
>
> I was offended by this and embarrassed for Doug. I didn't know how to take it. I have never seen anything like this in my life. What he did was horrible and created an uncomfortable atmosphere at work.
>
> Soon it was known throughout the plant that Doug had reported the incident. The following week, John Levy approached me and told me that I should not get involved with this situation. I told him that if anyone asked me anything, that I would tell them the truth.

*Id.*[1]

The following day, plaintiff called defendant's corporate "compliance hotline," a complaint line operated by a third party, to which any employee could make a complaint. *See* Sorenson Decl. ¶ 3. Plaintiff complained about the incident.[2] The compliance hotline interviewer took down his complaint, and prepared a report, Plaintiff's Exhibit 8, which was sent to defendant's corporate legal counsel. *See* Sorenson Decl. ¶¶ 3-4. Defendant's legal counsel then forwarded the report to the human resources department. *See id.* ¶ 4. John Levy also called the compliance hotline on July 25, 2003, to report that on July 24, 2003, plaintiff had called him a "fat motherfucker," and ridiculed his weight and abilities. *See id.*, Ex. A.

After receiving the reports, defendant's director of human resources, Judy Sorenson, visited the Hayward facility to investigate. *See* Sorenson Decl. ¶ 8. Sorenson spent two days at the facility interviewing various employees, including plaintiff and Levy, about the incident. *See id.* ¶¶ 9-13. Sorenson ultimately concluded that "John Levy should be issued a warning for engaging in inappropriate conduct." *Id.* ¶ 14. Desombre issued the recommended warning to Levy, Desombre Declaration, Exhibit J, and also "had Mr. Sepulveda and the other lead, Mr. Worley, work with Mr.

---

[1] Mr. Besabe's account states that the incident occurred on July 30, 2003. Counsel for plaintiff clarified at hearing, however, that Mr. Besabe misdated the account and was, in fact, describing the July 24, 2003 incident.

[2] Plaintiff also reported the harassment to the Department of Fair Employment and Housing (DFEH) on July 29, 2003.

3

1 O'Neil as much as possible," *id.* ¶ 23.

2 According to plaintiff, Levy continued to harass him after the July 24th incident. *See, e.g.,*
3 O'Neil Depo. (Pl.'s Ex. 1) at 273:10-11 ("[T]he harassment started before then and it continued after.");
4 264:12-18[3] ("Q. So that's what you mean by the . . . continued harassment, he was threatening you with
5 your job?  A. With my job, calling me a pussy, talking about my fissure, . . . all of these things.");
6 263:19-21[4] ("'I shouldn't have to work like this with this man constantly calling me pussies and names
7 and stuff like that at the job.'").

8 Over the following months, plaintiff was absent from work on several occasions, and did not
9 follow company policy in reporting his absences. *See* Desombre Decl. ¶ 24. According to plaintiff, he
10 began missing work because of the stress caused him by Levy's continued harassment. *See* O'Neil
11 Depo. (Pl.'s Ex. 1) at 274, 284-285. On September 29 and October 6, 2003, plaintiff received official
12 warnings for his absenteeism. *See* Desombre Decl., Ex. K. On Friday, December 12, 2003, plaintiff
13 again missed work, without notifying his supervisors. *See id.* ¶ 27. On Monday, December 15, 2003,
14 Desombre terminated plaintiff's employment. *See id.* ¶¶ 28-29.

15 Plaintiff filed a complaint in Alameda County Superior Court on September 6, 2005 alleging five
16 causes of action under state law:  harassment, retaliation, wrongful termination in violation of public
17 policy, disability discrimination, and intentional infliction of emotional distress. On June 23, 2006,
18 defendant removed the case to this Court, based on diversity of citizenship. Defendant now moves for
19 summary judgment on all of plaintiff's claims.

## LEGAL STANDARD

---

[3]Defendant objects to these lines of deposition testimony on relevance grounds. The Court OVERRULES defendant's objection. Plaintiff's statement bears directly on his first claim, as discussed below. Defendant also objects to all of the deposition excerpts submitted by plaintiff on the ground that plaintiff did not include a reporter's certification of the deposition transcript. The Court OVERRULES this objection. Defendant submitted excerpts from the same deposition transcript, along with the reporter's certification, and provides no reason to doubt the authenticity of plaintiff's excerpts. *See* Champagne Decl., Ex. B at 372.

[4]Defendant objects to these lines of deposition testimony on relevance grounds. The Court OVERRULES defendant's objection. Plaintiff's statement bears directly on his first claim, as discussed below.

4

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

On a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied*, 479 U.S. 949 (1986).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2d. Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980). The party who will have the burden of proof must persuade the Court that it will have sufficient admissible evidence to justify going to trial.

**DISCUSSION**

**I.      Disability harassment**

Plaintiff's first cause of action alleges that he suffered disability harassment under the California Fair Employment and Housing Act (FEHA). Defendant asserts that it is entitled to summary judgment

5

on this claim due to plaintiff's failure to demonstrate the objective hostility of his work environment.

An employer is liable for conduct giving rise to a hostile work environment if plaintiff proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. *Kortan v. California Youth Authority*, 217 F.3d 1104, 1090-10 (9th Cir. 2000).[5] To survive summary judgment, plaintiff must show the existence of a genuine factual dispute as to whether a reasonable disabled person would find the workplace so objectively and subjectively hostile as to create an abusive working environment. *See McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004). In determining whether challenged conduct constitutes an actionable hostile work environment, courts must consider "all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275, 2283 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 370 (1993)).

The Court concludes that plaintiff's evidence of a hostile work environment is sufficient to survive summary judgment. Defendant argues that plaintiff only presents evidence of one incident of disability-based harassment – the July 24, 2003 tirade by John Levy described above. Contrary to defendant's argument, however, the record contains reference to other incidents of disability-based harassment by Levy. Though plaintiff's deposition testimony does not contain any specific descriptions of harassment other than the July 24th incident, it does repeatedly mention ongoing, continual harassment by Levy, both before and after July 24th. *See, e.g.,* O'Neil Depo. (Pl.'s Ex. 1) at 273:10-11 ("[T]he harassment started before then and it continued after."); 264:12-18 ("Q. So that's what you mean by the . . . continued harassment, he was threatening you with your job? A. With my job, calling me a pussy, talking about my fissure, . . . all of these things."); 263:19-21 ("'I shouldn't have to work

---

[5] Many of the cases cited in the Order addressed claims brought under Title VII. "Title VII and FEHA operate under the same guiding principles." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).

6

like this with this man constantly calling me pussies and names and stuff like that at the job.'"). The July 24th incident, combined with evidence that similar harassment continued in the following months, is sufficient to raise a triable issue as to whether the harassment was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment.

Defendant also argues that it is not liable for the conduct of Levy because it took appropriate action to investigate and deter the harassment. Under FEHA, an employer is stricly liable for harassment by a supervisory employee, but "is not liable for acts of harassment committed by a nonsupervisory employee . . . unless the employer failed to take immediate and appropriate corrective action." *Hope v. California Youth Auth.*, 134 Cal. App. 4th 577, 593 (Cal. Ct. App. 2005) (citing Cal. Gov. Code § 12940(j)(1)).

As an initial matter, the parties dispute whether Levy was a supervisory or nonsupervisory employee. FEHA defines "supervisor" as:

> any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, *or the responsibility to direct them*, or to adjust their grievances, or effectively to recommend that action, *if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment*.

Cal. Gov. Code § 12926(r)) (emphasis added). As discussed above, Levy was a "lead." He and the other lead were instructed by the managers each morning on what tasks needed to be done. The leads then delegated the tasks among the employees, including plaintiff. *See* Desombre Decl. ¶ 6 ("The two leads were then to assign tasks to the other production employees, based upon the instructions we had given them."); Sepulveda Decl. ¶ 11 (Levy "was supposed to ask production employees to perform certain tasks, based upon Mr. Desombre's and my instructions."). It is unclear from these declarations whether Levy had discretion to assign tasks as he saw fit, or whether Desombre and Sepulveda told him which employee was to perform each task. As such, there is a factual question as to whether Levy's "responsibility to direct" other employees was "not of a merely routine or clerical nature, but require[d] the use of independent judgment." Cal. Gov. Code § 12926(r). Accordingly, the Court cannot conclude that defendants are not strictly liable for Levy's conduct.

Even if Levy was a nonsupervisory employee, however, plaintiff has raised a triable issue as to

7

whether defendants took immediate and appropriate corrective action in response to the harassment by Levy. As mentioned above, after plaintiff called the corporate compliance line to complain about the July 24th incident, defendant's director of human resources, Judy Sorenson, visited the Hayward facility to investigate. *See* Sorenson Decl. ¶ 8. Sorenson spent two days at the facility interviewing various employees, including plaintiff and John Levy, about the incident. *See id.* ¶¶ 9-13. Sorenson ultimately concluded that "John Levy should be issued a warning for engaging in inappropriate conduct." *Id.* ¶ 14. Desombre issued the recommended warning to Levy, and also "had Mr. Sepulveda and the other lead, Mr. Worley, work with Mr. O'Neil as much as possible." Desombre Decl. ¶¶ 21, 23. This evidence, defendant argues, conclusively demonstrates that it fulfilled its obligation under FEHA to take immediate and appropriate corrective action.

The Court disagrees, and finds that plaintiff has raised a triable issue as to whether defendant took appropriate corrective action. Considering the severity of the July 24th incident, there is a triable issue as to whether a mere warning to Levy was sufficient corrective action. Furthermore, as discussed above, plaintiff has provided evidence that Levy continued to harass him after the July 24th incident, and after Sorenson's investigation. Plaintiff also testified at deposition that he told Desombre of the continuing harassment, and Desombre took no corrective action. *See, e.g.,* O'Neil Depo. (Pl's Ex. 1) at 276:8-11 ("'I mean, you are the manager, and you're not doing anything about it. Tell him to leave me alone.' And I would repeatedly tell him that, but he would do nothing."). Accordingly, the Court DENIES defendant's motion for summary judgment on plaintiff's first cause of action.

## II.    Retaliation, disability discrimination, and wrongful termination

Plaintiff's second, third, and fourth claims, for retaliation, disability discrimination, and wrongful termination in violation of public policy[6], all depend on a theory that defendant fired plaintiff for illegal reasons. This theory ultimately fails, and the Court therefore must GRANT defendant's motion for summary judgment on plaintiff's second, third, and fourth causes of action.

---

[6]California state law permits a claim of wrongful termination in violation of public policy where termination of employment occurs in violation of a fundamental state policy delineated in constitutional or statutory provisions. *See Freund v. Nycomend Amersham*, 347 F.3d 752, 758 (9th Cir. 2003). Plaintiff's wrongful termination claim is based on defendant's alleged violation of FEHA.

8

Under FEHA, courts employ the same burden shifting framework as is used to evaluate claims of retaliation and disparate treatment under Title VII. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (disparate treatment under Title VII); *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 354 (2000) (disparate treatment under FEHA); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (retaliation under Title VII); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005) (retaliation under FEHA). This burden shifting works as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations and quotation marks omitted).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) his employer subjected him to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Manatt v. Bank of America*, 339 F.3d 792, 800 (9th Cir. 2003). To show a causal link, a plaintiff may use circumstantial evidence, but he or she must demonstrate the employer's knowledge of the protected activity and proximity in time between the protected activity and the adverse action. *See Morgan v. Regents of the Univ. of California*, 88 Cal. App. 4th 52 (2000); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding retaliatory actions three months after a protected activity supports the plaintiff's prima facie case). A plaintiff may make a prima facie case of discrimination through direct or circumstantial evidence. *See Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997). A plaintiff may also create an inference of unlawful discrimination by meeting the four requirements outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to demonstrate a legitimate non-discriminatory reason for the adverse employment action. *Reynolds v. Brock*, 815 F.2d at 574; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). To satisfy this burden, the employer "need only produce admissible evidence which would

9

allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S. Ct. 1089, 1096 (1981).

Here, plaintiff fails to raise a triable issue as to his termination-based claims. The evidence in the record conclusively establishes that defendant had a non-pretextual, legitimate reason for terminating plaintiff. Specifically, the following excerpt of plaintiff's own deposition testimony completely undercuts his termination-based claims:

> Q. Now, you were told the reason you were terminated was due to attendance, right?
> A. Yed [Desombre][7] told me I was fired because I didn't call in. I remember that.
> Q. Okay. That's attendance, right?
> A. Yeah.
> Q. Okay. What do you think the reason for your termination was?
> A. I believe Yed feel [sic] like it was because of my attendance. And I believe he really feel [sic] it was because of my attendance. And I feel that, too. But you have to understand why I was missing all of those days when I was being harassed.
> Q. Is there any other reason you think you were terminated other than what you have already told me?
> A. No. I can't think of any.

O'Neil Depo. at 320:24-321:15 (Champagne Decl., Ex. A). Plaintiff thus admits that defendant fired him for a legitimate, non-retaliatory reason, and that the reason was not pretextual. Accordingly, plaintiff's termination-based claims fail, as a matter of law, and the Court GRANTS defendant's motion for summary judgment on plaintiff's second, third, and fourth causes of action.

## III.   Intentional infliction of emotional distress

Finally, defendant moves for summary judgment on plaintiff's fifth cause of action, for intentional infliction of emotional distress (IIED). Under California law, "the elements of the tort of [IIED] are (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct . . . . The defendant must have engaged in 'conduct intended to inflict

---

[7]According to plaintiff, "Desombre is the individual that terminated Plaintiff." Oppo. at 19:2.

10

injury or engaged in with the realization that injury will result.'" *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (quoting *Davidson v. City of Westminster*, 32 Cal. 3d 197, 209-10 (1982)).

In order for conduct to be considered "extreme and outrageous," the "[c]onduct [] must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Cervantez v. J. C. Penney Co.*, 24 Cal. 3d 579, 593 (Cal. Sup. Ct. 1979). This standard sets a very high bar; it is "the California rule that 'it is not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Pardi v. Kaiser Permanente Hosp., Inc.*, 389 F.3d 840, 852 (9th Cir. 2004) (quoting case). This "rule is of course easy to state but only can be applied with certainty in light of the holdings in decided cases which have determined that the questioned conduct before them was or was not outrageous." *Soto v. Royal Globe Ins. Co.*, 184 Cal. App. 3d 420 (Cal. Ct. App. 1986).

Here, plaintiff has raised a material issue as to whether John Levy's harassment of him was outrageous. Plaintiff fails to articulate, however, how defendant's actions were outrageous. Plaintiff argues that "the evidence creates a triable issue as to whether the employer actually took any meaningful corrective steps. Instead, management denied the incidents even occurred and lied about the basis for his termination." Oppo. at 20:6-9. Plaintiff cites no authority in support of his theory that a failure to properly control or discipline a harassing employee can serve as the basis for an IIED claim, and the Court finds none. Accordingly, the Court GRANTS defendant's motion for summary judgment on plaintiff's IIED claim.

///

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART

11

**United States District Court**
For the Northern District of California

defendant's motion for summary judgment.[8]  [Docket No. 42]

**IT IS SO ORDERED.**

Dated: August 6, 2007

*(signature)*
SUSAN ILLSTON
United States District Judge

---

[8] Defendant also filed 54 single-spaced pages of evidentiary objections. With the exception of the lines of plaintiff's deposition testimony discussed above, in footnotes three and four, the Court did not rely on any of the objected-to evidence in denying defendant's motion for summary judgment on plaintiff's first claim. The Court therefore DENIES AS MOOT the remainder of defendant's objections.